UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

NOHA H. AHMAD,                          )
                                        )
              Plaintiff,                )
                                        )
v.                                      )        1:17-cv-1393 (IDD)
                                        )
NANCY A. BERRYHILL,                     )
Acting Commissioner of Social Security, )
                                        )
              Defendant.                )
_____)

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on the parties' cross-motions for summary judgment. Plf. Mot. for Summ. J., ECF. No. 17 [hereinafter Plf. Summ. J.]; Def. Mot. for Summ. J., ECF No. 22 [hereinafter Def. Summ. J.]. Pursuant to 42 U.S.C. § 405(g), Noha Hussien Ahmad ("Plaintiff") seeks judicial review of the final decision of the Commissioner of the Social Security Administration ("Defendant") denying her claim for disability insurance benefits ("DIB") under Title II of the Social Security Act ("the Act"), 42 U.S.C. § 423. For the reasons stated below, the undersigned finds that Plaintiff's Motion for Summary Judgment is **DENIED** and Defendant's Motion for Summary Judgment is **GRANTED**.

## I.    PROCEDURAL BACKGROUND

Plaintiff filed her application for DIB on June 8, 2013, alleging disability commencing on September 9, 2010, based on the following severe impairments: pituitary disorder, vertiginous syndrome, right maxillary sinus nodules/sinusitis, total thyroidectomy with hypothyroidism/hypoparathyroidism, vestibular disorder, cholecystectomy, appendectomy, degenerative disc disease, Heberden nodes of the hands, C7 vertebral body hemangioma,

1

osteoporosis/osteopenia, osteoarthritis of the right ankle, fibromyalgia, hypomenorrhea, continued arterial hypertension, diabetes mellitus type II depression, and anxiety disorder. Administrative Record ("R.") 18, 216, 234.

After the state agency denied Plaintiff's claim twice, Plaintiff requested an administrative hearing. R. 152, 165. The Administrative Law Judge ("ALJ") held a hearing on November 30, 2016. R. 15, 36-90. On February 21, 2017, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Act. R. 15–35.

On October 3, 2017, the Appeals Council for the Office of Disability and Adjudication denied Plaintiff's request for review of the ALJ's decision, rendering the ALJ's decision the final decision of the Commissioner for purposes of review under 42 U.S.C. § 405(g). R. 1–6. Having exhausted her administrative remedies, Plaintiff filed the instant suit challenging the ALJ's decision on December 7, 2017. Compl., ECF No. 1. This matter is ripe for disposition because the parties filed cross-motions for summary judgment and oral arguments were heard on November 2, 2018.

## II.    FACTUAL BACKGROUND

Plaintiff was born on November 16, 1966, and was forty seven (47) years old at the time of her alleged onset date: June 30, 2014. R. 15, 28. Plaintiff is a college graduate and worked as a school bus attendant, retail cashier, and veterinarian at a poultry farm. R. 41. Plaintiff is married and has a minor daughter. R. 40-41.

### A.    Medical Evidence

On September 16, 2010, Plaintiff visited the emergency room at Inova Fair Oaks Hospital complaining of facial pain. R. 554. Plaintiff was diagnosed with acute sinusitis, but there was no finding of sinus opacification or acute intracranial abnormality. R. 554. There was mild mucosal

thickening within the ethmoid sinuses and a possible mucosal retention cyst. R. 554. Plaintiff's mastoid air cells were well aerated. R. 554. Plaintiff was prescribed Antivert, Phenergan, and Ativan. R. 556. Plaintiff was discharged on the same day in stable condition. R. 556.

Between October 2010 and January 2011, Plaintiff visited the Neurology Center of Fairfax, Ltd. ("Neurology Center") multiple times. R. 433-36, 524, 531. During her October 2010 visit, Plaintiff developed episodic vertigo (triggered by head movement) with associated right-side pulsatile tinnitus. R. 433, 530. Upon examination, Plaintiff was described as pleasant and cooperative with a normal tone. R. 434, 531. Doctor Marco D. Castro, M.D., also noted that she had a normal cardiovascular system, grossly normal mental status, speech, and language, full strength in both arms and legs, intact coordination, and normal light touching. R. 434, 531. A visit to the Neurology Center in November 2010, revealed no electrophysiologic evidence of a generalized peripheral neuropathy, bilateral carpal tunnel syndrome, right ulnar neuropathy, or right cervical or lumbosacral radiculopathy in response to Plaintiff's complaint of tingling sensation around her mouth, hands, and feet. R. 436, 524. In January 2011, Plaintiff reported an improvement in her dizziness and that her paresthesia was less frequent. R. 435. Plaintiff's neurological evaluation and gait were normal and she had full strength in both arms and legs. R. 435.

In May 2011, Plaintiff reported that she has a history of motion illness since childhood and has had transient episodes of vertigo for years. R. 658. In June 2011, Plaintiff reported that she had improvements in her overall function, can engage in routine domestic tasks, and can walk her daughter to school if she feels well enough. R. 656. Plaintiff also indicated that she can bathe and dress herself. R. 656. An examination on December 28, 2011, revealed that Plaintiff had a full range of motion in her neck, no cervical adenopathy, normal cardiovascular exam,

clear lungs, normal neurological exam, good eye contact, and depressed mood. R. 723. In April 2012, Plaintiff reported that she had been walking every day. R. 712.

On May 1, 2012, Plaintiff was evaluated at the National Institute of Health ("NIH") for management of her endocrine disorder R. 1067. Plaintiff complained of weight gain after being diagnosed with type II diabetes, easy bruising, insomnia, and proximal muscle weakness. R. 1066. Plaintiff was instructed to discontinue Prednisone and start hydrocortisone, and return in one (1) week for an ACTH (adrenocorticotropic hormone) stimulation test. R. 1068.

On June 5, 2012, Plaintiff went to a follow up visit at NIH for management of diabetes, hypoparathyroidism, and adrenal insufficiency. R. 1206. There were no clinical signs of adrenal insufficiency and Plaintiff was advised to continue her dosage of calcium and calcitriol to treat hypoparathyroidism. R. 1208-09.

From November 29, 2012, to December 2, 2012, Plaintiff was hospitalized at NIH for partial central adrenal insufficiency. R. 1001-03, 1055. After administering a low dose of a cosyntropin stimulation test and metyrapone test, it was "confidently" concluded that Plaintiff did not have any degree of adrenal insufficiency. R. 1056. Plaintiff was discharged in stable condition. R. 1057.

On January 10, 2013, Plaintiff visited Healthworks for Northern Virginia ("Healthworks") complaining of sinusitis, abdominal pain, finger joint pain, right shoulder pain, and diffuse muscle aches. R. 681. Plaintiff was diagnosed with fibromyalgia, chronic sinusitis, osteoarthritis, a mild tear/strain in her rotator cuff disc, diabetes, and an upper respiratory infection. R. 683. Plaintiff was prescribed Trazodone to treat her fibromyalgia and Omnaris spray for her chronic sinusitis. R. 683. She was also shown isometric strengthening exercises to treat the tear in her rotator disc cuff. R. 684.

On January 10, 2013, Dr. Glenn Tomkins, M.D., Plaintiff's primary care physician, examined Plaintiff. R. 681. She reported pain in her fingers for six (6) months, myalgia in her back, chest, and shoulder, fatigue, and low energy. R. 681-82. On examination, Plaintiff had slightly tender finger joints, but no limitation in range of motion, pain in her right shoulder when elevated to ninety (90) degrees, pain with hyperextension of the right knee, and tender points in her upper back. R. 681-83. Doctor Tomkins assessed fibromyalgia, diabetes in good condition, osteoarthritis not generalized or localized, and a mild rotator cuff tear. R. 683-84. Plaintiff was prescribed new medications and some medications were refilled. R. 683-84.

Plaintiff followed up with Dr. Tomkins in four (4) weeks. R. 675. Plaintiff had not taken any of the prescribed medications and was not following isometric strengthening recommendations for her rotator cuff disc. R. 678. Plaintiff was given prescription to treat her chronic sinusitis, fibromyalgia, rotator cuff disc, and osteoarthritis. R. 679.

On May 2, 2013, Plaintiff returned to Dr. Tomkins and complained of a headache, swishing sounds in her right ear, arm pain and swelling, and thigh pain. R. 778. Doctor Tomkins noted that April 2013 x-rays did not reveal any vertebral body issues or any other contributory findings. R. 778. Plaintiff appeared alert, oriented, and in no distress. R. 778. She had full strength bilaterally, 2/4 reflexes and symmetric in upper extremities, no tremors, clear speech, and normal gait. R. 778. Doctor Tomkins continued her medications and ordered labs for her diabetes, headache, cholesterol, and hypoparathyroidism. R. 779. A few weeks later, Plaintiff reported that her sinusitis was under control and most of her headaches resolved with medications. R. 764. Plaintiff was sleeping six (6) to eight (8) hours a night and her vertigo improved with a vestibular program and medications. R. 765. Doctor Tomkins assessed Plaintiff's fibromyalgia, but noted that the labs refuted any inflammatory process. T. 768.

In a June 2013 examination with Dr. Tomkins, Plaintiff reported headaches and mild tenderness to her left neck and thyroid. R. 756. Doctor Tomkins noted fibromyalgia without inflammatory markers and that Trazadone normalized Plaintiff's sleep. R. 757. Later that month, Plaintiff complained that her right-hand pain was worse, but there was no tenderness or swelling in her finger joints. R. 739.

In July 2013, Dr. Tomkins noted that Plaintiff's myalgia decreased after stopping certain medications and that her fibromyalgia was partially attributable to the use of a statin. R. 732. In August 2013, Plaintiff reported that she received "near total relief" from the chronic headaches with use of Maxalt. R. 931. Doctor Tomkins opined that Plaintiff's metabolic abnormalities might explain her fibromyalgia syndrome. R. 935.

In September 2013, Plaintiff visited both Dr. Tomkins and Dr. Andrew Demidowich, M.D. R. 923, 1327-38. Plaintiff reported that Lyrica helped with her body aches, Nortriptyline was helping her sleep better, and there were no specific tasks that were impossible or difficult. R. 923-24. Plaintiff denied anxiety, lethargy, and difficulty sleeping. R. 1327-38. Doctor Tomkins reported that Plaintiff had normal strength. R. 926.

Doctor Tomkins wrote a letter on October 11, 2013, describing Plaintiff's medical conditions. R. 943. Doctor Tomkins noted that Plaintiff suffers from fibromyalgia, which limits her to "sedentary work that does not require ambulation beyond five minutes at a time, or lifting more than five pounds, or lesser exertion prolonged past 10 minutes." R. 943. Also stated was that Plaintiff suffers from inflammatory bowel disease, which can be treated within weeks, but requires frequent bathroom breaks. R. 944. Doctor Tomkins opined that Plaintiff has uncontrolled headaches and vertigo with nausea, which are severe enough to keep her from work on an "average of 10% of days, though this is variable from month to month, and can reach up to

25% of days some months." R. 944.

On December 28, 2013, Plaintiff had an infectious disease consult. R. 1220. Plaintiff complained that she was experiencing intermittent fevers and myalgia about two (2) to three (3) times a month. R. 1220. Plaintiff stated that she had a complete resolution of her symptoms while she was taking Prednisone. R. 1220. She also noted improvement in her symptoms when she discontinued Simvastatin. R. 1220. The physician found that her basic lab results appeared within normal limits, except with a mildly elevated ALT (a type of liver enzyme). R. 1221. The physician also opined that her symptoms were intermittent, which made the infectious process less likely, and had a resolution with her symptoms while she was on steroids. R. 1221.

On April 3, 2014, Plaintiff visited Dr. Liaw Winston, M.D., complaining of neck, right arm, and finger pain. R. 1161. Plaintiff was assessed with acute neck pain and prescribed Cyclobenzaprine and Imitrex. R. 1163. A few days later, on April 8th, Plaintiff visited Healthworks complaining of neck, head, back, and arm pain, and a swollen middle finger. R. 1155. Plaintiff was advised to continue Pregabalin to treat her fibromyalgia and Naproxen and Cyclobenzaprine to treat her muscle strain. R. 1158. Also, during this month, Plaintiff told Dr. Tomkins that Lyrica was providing her with relief for her diffuse muscle pain. R. 1155. Doctor Tomkins noted that Plaintiff's fibromyalgia was responding fairly well to Pamelor. R. 1157.

In May 2014, Plaintiff had a neuromuscular consult with the University of Virginia Hospital. R. 1135. Plaintiff reported a history of generalized weakness for more than six (6) months and weakness over the last seven (7) years. R. 1135. Doctor Sarah Jones, M.D., indicated that Plaintiff had normal strength in her neck, giveaway weakness in her limbs with normal bursts of strength, and decreased sensation to light touch in the right face and leg. R. 1136. Plaintiff could stand with arms crossed, had a normal gait, and could walk on her heels and

toes. R. 1136. Doctor Jones reported that there were no clear neuromuscular abnormalities to explain her symptoms. R. 1137.

Doctor Tomkins wrote another letter on May 5, 2015, stating that Plaintiff's abilities are limited by her fibromyalgia. R. 1260. The fibromyalgia pain limits Plaintiff to "sedentary work that does not require ambulation beyond ten minutes at a time, or lifting more than ten pounds, or lesser exertion prolonged past 10 minutes." R. 1260. Doctor Tomkins also reported that Plaintiff's arthritis is active and treatment was going to start in a few weeks, Plaintiff started seeing a psychiatrist for possible depression and anxiety, but her symptoms overlap with chronic sleep deprivation. R. 1260-61. In an addendum written on May 31, 2016, a year later, Dr. Tomkins stated that Plaintiff's fibromyalgia is unchanged and her hand arthritis is present. R. 1395.

### i. Diagnostic Images

In September 2010, a Magnetic Resonance Imaging ("MRI") of both of Plaintiff's temporomandibular joints revealed no evidence of disc displacement or focal bone abnormality, and had normal range of motion. R. 558. An MRI angiography of Plaintiff's brain, pituitary, and neck taken on October 22, 2010, revealed no abnormal findings. R. 426-428. An MRI of Plaintiff's head and pituitary gland taken on April 18, 2013, found a few nonspecific small FLAIR hyperintense foci, but no restricted diffusion abnormality of the brain. There was no definite mass in the sella turcica and the paranasal sinuses were unremarkable. R. 1032-33, 1045-46. An MRI of Plaintiff's brain and pituitary was taken on February 7, 2014. R. 1107, 1169. The results revealed stable postoperative changes within the nasal fossa and sella turcica without evidence of residual or recurrent pituitary adenoma. R. 1107.

In response to Plaintiff's complaint of neck pain and osteoporosis, x-rays of Plaintiff's cervical, thoracic, and lumbar spine were taken on April 3, 2013. R. 1040. The x-rays were unremarkable. R. 1040. X-rays of Plaintiff's chest taken on May 17, 2013, revealed clear lungs, a normal cardiac silhouette, and no pneumothorax or pleural effusion. R. 1031. In response to Plaintiff's complaint of lower back pain, x-rays of her lumbar spine and thoracic spine were taken again on June 18, 2013. R. 1028-29. Stable tiny anterior osteophytes at L4 and L5 were found, but there were no acute fractures or subluxation and the SI joins were unremarkable. R. 1028. Plaintiff had a stable but mild degenerative change in her thoracic spin. R. 1029. An MRI taken on April 9, 2014, of Plaintiff's cervical spine revealed mild to moderate degenerative changes. R. 1170.

Axial images were taken on December 21, 2011, of Plaintiff's abdomen and pelvis because of flank pain. R. 1047. The images revealed hepatic steatosis, an enlarged liver. R. 1047. There was no evidence of bowel wall abnormality and her spleen, pancreas, adrenals, kidneys, and bladder were normal. R. 1047. On August 9th and 21st of 2013, contiguous axial images performed through Plaintiff's abdomen and pelvis showed diffuse fatty deposition throughout the liver, but a normal spleen, pancreas, adrenal, kidneys, stomach, bladder, vasculature, osseous structures, and lungs. R. 795, 812, 1026. Radiologist results from December 23, 2013, found that Plaintiff's heart was normal, her lungs were clear, and her bony structures were intact. R. 1181. A nuclear medicine whole body bone scan was taken on August 18, 2014. R. 1172. The scan revealed no evidence of abnormality to suggest osseous metastatic disease, but did reveal degenerative and/or post traumatic uptake involving the medial aspect of the right ankle. R. 1172.

On January 10, 2014, a computerized tomography scan ("CT scan") was taken of

Plaintiff's chest, abdomen, and pelvis. R. 1123, 1179. There were unremarkable findings of Plaintiff's heart, pancreas, kidneys, and bowel. R. 1123, 1179. Her chest wall had no axillary adenopathy and her abdomen revealed decreased hepatic attenuation. R. 1123, 1179.

Radiographs of Plaintiff's hands revealed no fracture or dislocation and no radiographic evidence of rheumatoid or osteoarthritis. R. 1171.

## B.    Mental Health:

On January 9, 2012, Plaintiff attended a mental health assessment at Healthworks. R. 969. Plaintiff's depression started in 1982 and she was experiencing worsening depressive symptoms the past two (2) years. R. 969. Plaintiff stated that she was suffering from sleep disturbance, sad feelings, intermittent anxiety attacks, pain in her head, neck, and shoulders, and racing thoughts. R. 969. A February 2012 mental status examination indicates that Plaintiff presented within normal limits and did not have suicidal or homicidal ideations. R. 967.

On April 2, 2012, Plaintiff attended a medication consult for her depression. R. 712. Plaintiff indicated that there had been no improvement in her symptomatology even though she tried multiple selective serotonin reuptake inhibitors. R. 712. Plaintiff indicated that she walks daily, but avoids contact with others and does not answer the phone unless the call is from her husband or her daughter. R. 712. Plaintiff reported she is often irritable and cannot stay asleep. R. 712. Plaintiff denied self-harm ideation and felt that she has a "good life." R. 712. Plaintiff was diagnosed with depressive disorder and prescribed Lamotrigine. R. 713. A month later, Plaintiff indicated that she was feeling less anxious and she was doing well with Lamotrigine. R. 708. On July 2012 medical notes indicate that Plaintiff's depressive symptoms were resolved, and her anxiety disorder improved. R. 697.

In August 2012, reports indicate that Plaintiff was friendly and engaged, had no suicidal

or homicidal ideations, and no depression or anxiety related symptoms. R. 958. In a counseling session in November 2012, Plaintiff reported that she was not sleeping well, she had a change in appetite, and feels depressed. R. 956. Plaintiff was friendly and engaged during this session. R. 957.

Plaintiff attended an individual counseling session on February 22, 2013. R. 954. Plaintiff had mild depression with no suicidal ideations. R. 954. Her anxiety level was moderate. R. 954. Plaintiff did not have any hallucinations or eating disorders. R. 954. Various mental status examinations revealed that Plaintiff had an appropriate affect and mood, good grooming, made good eye contact, was pleasant, and had no suicidal ideations. R. 954, 775, 945, 951, 1009.

On September 25, 2013, a psychology examination was conducted. R. 946. Plaintiff was noted to be alert, oriented, and anxious. R. 946. Plaintiff described fluctuations in her mood. (R. 946). Plaintiff was told to do breathing exercises. R. 946.

## C.    State Agency Opinion Evidence

The State Agency's medical consultants ("Consultants") determined on initial and reconsideration levels that Plaintiff was able to perform sedentary work with postural and environmental limitations. R. 26, 127-130, 145-150. The Consultants also found that Plaintiff had moderate limitation in completing a normal workday and workweek without interruptions and could perform at a consistent pace without an unreasonable number and length of rest periods. R. 128, 147. They also found that Plaintiff could concentrate long enough to carry out simple tasks, tolerate brief interactions with the general public and coworkers, and perform best in a low stress routine environment. R. 26, 127-130, 145-150.

**D.  Administrative Hearing Testimony**

On November 30, 2016, Plaintiff testified before the ALJ. R. 36-90. The following testimony relates to Plaintiff's functioning before June 2014 because Plaintiff's insurance policy expired on June 30, 2014. R. 40.

Plaintiff, a college graduate from Sudan with a degree in veterinary science, was born on November 16, 1966, and is married with minor daughter R. 40-41, 66. She has a driver's license, but has not driven since June 2014, pursuant to her doctor's advice, because she suffered from blackouts and dizziness. R. 42, 69. Plaintiff began using a cane in 2009 because she has muscle pain, anxiety, depression, and diabetes. R. 77.

Plaintiff's past employment includes a veterinarian at a poultry farm from January 1995 to August 2001, a retail cashier from March 2003 to January 2005, and a school bus attendant in Fairfax County from August 2004 to September 2011. R. 41, 62, 67. As a school bus attendant, Plaintiff rode the bus with the children, assisted them with getting on and off the bus, and operated the wheelchair lift. R. 67-68. Plaintiff stopped working in 2011 and has not applied for a job since then. R. 60, 63. Plaintiff's last day of work with Fairfax County was in September 2010. R. 63, 67. Plaintiff did not apply for jobs after September 2010 because she had dizzy spells, felt nauseous, had pain all over her body, and could not concentrate. R. 64.

Plaintiff stopped working as a school bus attendant because she got a severe sinus infection. R. 61. Her doctor initially gave her medication, but because it did not provide relief, her doctor authorized sick leave. R. 61. The sick leave began as a week and then increased to a month depending on the severity of her symptoms. R. 61. One day, Plaintiff felt dizzy and blacked out. R. 61. Plaintiff went to the emergency room and was diagnosed with vertigo. R. 61. Plaintiff's primary care physician referred her to a neurologist, who then referred her to physical

therapy. R. 61. After one (1) month of leave, the human resources department advised Plaintiff to apply for short term disability. R. 62. Plaintiff received short term disability benefits for four (4) months. R. 62. Afterwards, the human resources department advised her to apply for Social Security Disability. R. 63.

Plaintiff was diagnosed with chronic sinusitis and referred to NIH. R. 64-65. Plaintiff testified that every time she went to the doctor, she had an elevated temperature. R. 65. Plaintiff was also informed that she had an autoimmune disease, diabetes, high blood pressure, anxiety, hypopituitarism, and hypothyroidism. R. 65. Plaintiff believes that because she uses too much medication, some of her problems result from the side effects of the medication. R. 65.

In December 2012, Plaintiff flew to Sudan and stayed for approximately two (2) weeks. R. 43. She also flew to Sudan in the Summer of 2015. R. 43. She used an assistive device, such as a wheelchair, to travel. R. 48, 70. Plaintiff stated that she sometimes stays for five (5) or six (6) weeks. R. 44. She stays with her mother, and her family comes to visit her. R. 50. Plaintiff converses with her family or stays in her room and sleeps. R. 50. Before traveling, Plaintiff obtains advice from her doctor on whether she can travel. R. 70.

In June 2014, Plaintiff socialized with friends and family. R. 44. They would come to her house or call her five (5) or six (6) times. R. 44-45. Plaintiff also visited her cousin in Ashburn, Virginia. R. 45. Plaintiff testified that she does not answer the phone or knocks at the door because she feels dizzy sometimes. R. 45. During this time, Plaintiff was able to walk a certain distance (no specific measurement or estimation of the distance was given at the hearing) without stopping. R. 47. Plaintiff could stand for about fifteen (15) to twenty (20) minutes before she began to feel pain and needed to sit. R. 47. If Plaintiff sits for this same amount of time, she begins to feel pain in her lower back and neck, and weakness in her legs and abdomen. (R. 47).

When Plaintiff travels to Sudan, which includes a twelve (12) to thirteen (13) hour flight to Dubai, Plaintiff must walk around the plane every hour. (R. 48).

Plaintiff was taking Levothyroxine, Calcitriol, calcium, aspirin, Gabapentin or Lyrica, Claritin or Loratadine, Singulair, Simvastatin, Xanax, and Tricor. R. 45-46. Plaintiff testified that these medications helped her pain. R. 46. Plaintiff also testified that she suffers from side effects. R. 46. Specifically, Plaintiff feels dizzy when she uses ibuprofen, Lyrica, Gabapentin, and Xanax. R. 46. When Plaintiff uses medication for her migraines, she feels sleepy, dizzy, and nauseous. R. 46-47.

Plaintiff can lift a gallon of milk using both hands. R. 50. If Plaintiff tries to push or pull objects, then she experiences shoulder pain and arthritis pain in her hand. R. 50. Plaintiff's fingers also swell. R. 51. Plaintiff had trouble lifting her arms above her head because she had problems with the muscles in her shoulders and back. R. 51. Plaintiff has had trouble climbing stairs since 2009. R. 51.

Plaintiff lives in a townhouse that has three floors. R. 42. In order to get to her bedroom, Plaintiff must climb approximately twelve (12) steps. R. 51. She can climb two (2) or three (3) steps before stopping. R. 51-52. Plaintiff typically can go up and down the stairs once a day. R. 52.

Plaintiff also experiences trouble concentrating. R. 53. Specifically, she cannot remember things such as doctor appointments or when she needs to take her medication. R. 53. Plaintiff has discontinued relationships with her friends because she does not answer the phone when they call or open the door when they knock. R. 53-54. Plaintiff explained that she is either upstairs and cannot go downstairs or sleeping. R. 54.

Plaintiff's husband works three (3) days a week from 7 a.m. to 3 p.m. R. 54. He used to

work full time, but adjusted his schedule when Plaintiff "got sick." R. 54. Plaintiff's daughter attended Loudon Town Elementary School. R. 55. Plaintiff's husband drops her off at school and picks her up after school. R. 56. Plaintiff used to help her daughter with homework when she was in kindergarten, but now her husband helps her with homework. R. 56. Plaintiff's husband also attends parent/teacher conferences. R. 56. Plaintiff's husband does all the household chores. R. 59.

Plaintiff also stated that she has trouble using her hands and fingers because she has arthritis in her fingers and bumps on her hand. R. 52-53. Plaintiff testified that she has a computer at home, but uses her phone for internet and texting. R. 57. Plaintiff testified that she sometimes has trouble using her cell phone with her fingers, so she uses voice messages. R. 58. Plaintiff used a computer to fill out her application for DIB. R. 58. Plaintiff testified that she had some assistance from a counselor in filling out the form. R. 58.

Plaintiff then described a typical day in June 2014. R. 59. On a good day, Plaintiff sat with her family at the dining table to eat. R. 59. She would then lay on the couch and watch TV for about thirty (30) minutes. R. 59. On a bad day, Plaintiff would just lay in bed with the curtain drawn and lights off. R. 59. Plaintiff would get a headache whenever there was too much light. R. 59-60. Plaintiff would only leave her bed if she needed to use the bathroom because she felt dizzy and sleepy. R. 60. Plaintiff used to use a walker to get around. R. 60.

Prior to June 2014, Fairfax County provided Plaintiff with home accommodations because of her medical issues. R. 73. For example, the agency Rebuild Together provided her with handrails in her bathroom and along the staircase. R. 73-74. In addition to this, a counselor from the Department of Aging and Disabled comes to Plaintiff's house three (3) times a week to help her with bathing, showering, dressing, and preparing a light meal. R. 74-75. A nurse also

comes once a month or every three (3) months to check her vital signs. R. 75.

A vocational expert ("VE"), Dr. James Ryan, also testified at the hearing. R. 38, 79-84. The VE characterized Plaintiff's past work as a school bus attendant as a medium unskilled position. R. 80. The cashier position was characterized as a light unskilled position and the veterinarian position was characterized as a light skilled position. R. 80.

The ALJ posed one (1) hypothetical for the VE to answer. R. 80-82. The ALJ's hypothetical assumed an individual of the same age, education, and work experience, *i.e.* limited to sedentary work, as Plaintiff. R. 80-82. He also instructed the VE to assume an individual who can: frequently push or pull with both upper extremities; frequently operate foot controls with the right foot; occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl; never climb ladders, ropes, and scaffolds, frequently rotate, flex, and extend the neck; and frequently handle and finger bilaterally. R. 80. Additionally, the VE was instructed to assume that the individual would: be limited to jobs that can be performed while using a cane for ambulation; need to avoid concentrated exposure to extreme cold, heat, wetness, and humidity; avoid concentrated exposure to excessive noise vibration, and pulmonary irritants; avoid moderate exposure to hazardous moving machinery and unprotected heights; only be able to perform simple, routine and repetitive tasking in a low stress work environment with no strict production quotas; and be able to occasionally interact with the public, coworkers, and supervisors. R. 80-81. The VE testified that although the Plaintiff would not be able to perform her past work with these limitations, there were other jobs in the national economy that Plaintiff could perform. R. 81-82. Specifically, the VE testified that at the sedentary unskilled occupational base, there were 41,000 positions as a quality control worker, 48,000 positions as a bench worker, and 53,000 positions as a grading and sorting worker. R. 82.

Plaintiff's attorney then asked the VE a series of hypothetical questions. R. 82-84. For the first hypothetical, counsel asked whether work at all levels would be precluded if the individual could stand and/or walk for less than two (2) hours in an eight (8) hour workday and sit for two (2) hours in an eight (8) hour workday. R. 83. The VE answered that these limitations would preclude all work levels. R. 83. For the second hypothetical, counsel asked whether work at all levels would be precluded if the individual would need to take at least ten (10) unscheduled one (1) hour rest breaks during an eight (8) hour work day at unpredictable times. R. 83. The VE testified that the individual wouldn't work at all and would therefore be incapable of full-time employment. R. 843. For the third hypothetical, counsel asked whether work at all levels would be precluded if the individual could lift less than ten (10) pounds. R. 84. The VE testified that the jobs at the sedentary level would not be precluded. R. 84. For the final hypothetical, counsel asked whether work at all levels would be precluded if the individual was absent four (4) or more days per month. R. 84. The VE replied yes. R. 84.

## III.   STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, this Court is limited to determining whether the decision was supported by substantial evidence in the record and whether the correct legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). It is more than a mere scintilla but less than a preponderance of the evidence. *Craig*, 76 F.3d at 589. An ALJ is required to analyze all relevant evidence and sufficiently explain his or her findings. *Sterling Smokeless*

*Coal Co. v. Akers*, 131 F.3d 438, 439–40 (4th Cir. 1997). In reviewing the record for substantial evidence, the court should not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig*, 76 F.3d at 589). If the ALJ's determination is not supported by substantial evidence in the record, or if the ALJ has made an error of law, the district court must reverse the decision. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). The Commissioner's factual findings, if supported by substantial evidence, are conclusive and must be affirmed. *Perales*, 402 U.S. at 390.

The Fourth Circuit applies a harmless error analysis in the context of social security disability determinations. *See Mascio v. Colvin*, 780 F.3d 632, 639 (4th Cir.2015); *Hammond v. Colvin*, No. 1:12-CV-01177(AJT), 2013 WL 5972432, at *6 (E.D.Va. Nov. 8, 2013). The harmless error doctrine prevents a remand when the ALJ's decision is "overwhelmingly supported by the record though the agency's original opinion failed to marshal that support" and a remand would be "a waste of time." *Williams v. Berryhill*, No. 1:17-CV-167(TCB), 2018 WL 851259, at *8 (E.D. Va. Jan. 18, 2018) (citing *Bishop v. Comm'r of Soc. Sec.*, 583 Fed.Appx. 65, 67 (4th Cir. 2014) (per curiam)). An ALJ's error may be deemed harmless when a court can conclude on the basis of the ALJ's entire opinion that the error did not substantively prejudice the claimant. *See Lee v. Colvin*, No. 2:16-CV-61(RJK), 2016 WL 7404722, at *8 (E.D. Va. Nov. 29, 2016). When reviewing a decision for harmless error, a court must look at "[a]n estimation of the likelihood that the result would have been different." *See Morton-Thompson v. Colvin*, No. 3:14-CV-179(REP), 2015 WL 5561210, at *7 (E.D. Va. Aug. 19, 2015) (citing *Shineski v. Sanders*, 556 U.S. 396, 411–12 (2009)).

# IV.     ANALYSIS

## A.     Determining Disability and the Sequential Analysis

The Social Security Regulations define "disability" as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a). To meet this definition, the claimant must have a severe impairment or impairments that make it impossible to do past relevant work or any other substantial gainful activity that exists in the national economy. *Id.*; *see Heckler v. Campbell*, 461 U.S. 458, 460 (1983). The ALJ is required to employ a five-step sequential evaluation in every Social Security disability claim analysis to determine the claimant's eligibility. Specifically, the ALJ must consider whether the claimant: (1) is engaged in substantial gainful activity;[1] (2) has a severe impairment; (3) has an impairment that equals a condition contained within the Social Security Administration's official Listing of Impairments; (4) has an impairment that prevents past relevant work;[2] and (5) has an impairment that prevents her from any substantial gainful employment. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). After step three of the analysis, but before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's RFC. 20 C.F.R. §§ 416.920(e)–(f), 416.945(a)(1). *Morris v. Berryhill*, No. 3:16-CV-587(MHL), 2017 WL 4112365, at *6 (E.D. Va. Aug. 30, 2017), *report and recommendation adopted*, 2017 WL 4108939 (E.D. Va. Sept. 15,

---

[1] Substantial gainful activity is work that is both substantial and gainful as defined by the Agency in the Code of Federal Regulations. Substantial work activity "involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." 20 C.F.R. § 404.1572(a). Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b). Taking care of oneself, performing household tasks, hobbies, therapy, school attendance, and the like are not generally considered substantial gainful activities. 20 C.F.R. § 404.1572(c).
[2] Past relevant work is defined as substantial gainful activity in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved. 20 C.F.R. §§ 404.1560(b), 404.1565(a).

2017).

**B.      ALJ's Findings**

In accordance with the five-step sequential analysis, the ALJ made the following findings of fact and conclusions of law. At step one, the ALJ found that Plaintiff met the insured status requirements of the Act through June 30, 2014. R. 17. At step two, the ALJ determined that Plaintiff has not engaged in substantial gainful activity from September 9, 2010, the alleged onset date, through the date of last insured, June 30, 2014. R. 17. At step three, the ALJ found that Plaintiff suffered from the following severe impairments: status post transsphenoidal hypophysectomy with panhypopituitarism; right maxillary sinus nodules/sinusitis; total thyroidectomy with hypothyroidism; vestibular disorder; cholecystectomy; appendectomy; degenerative disc disease; Heberden nodes of the hands; vertebral body hemangioma; osteoporosis; osteoarthritis of the right ankle; depression; and anxiety disorder. R. 18. At step four, the ALJ determined that none of the impairments or combination of impairments met or medically equaled the severity of one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1. R. 19. Finally, at step five, the ALJ found that Plaintiff has the residual functional capacity ("RFC") to perform sedentary work as defined in § 404.1567(a). R. 21. Specifically, the ALJ found that Plaintiff had the RFC to:

> [F]requently push/pull with the bilateral upper extremities; frequently operate foot controls with the right foot; occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl; never climb ladders, ropes, or scaffolds; frequently rotate, flex, and extend the neck; frequently handle and finger bilaterally; limited to jobs that can be performed using a cane for ambulation; avoid concentrated exposure to extreme cold and heat, wetness, and humidity, excessive noise and vibration, and pulmonary irritants, including fumes, odors, dusts, gasses, and poorly ventilated areas; avoid moderate exposure to hazardous moving machinery and unprotected heights; perform simple, routine, and repetitive tasks in a low stress work environment defined as no strict production quotas; and occasionally interact with the public, coworkers, and supervisors.

R. 21. The ALJ determined that Plaintiff had the RFC to perform the full range of sedentary work and can make a successful adjustment to other work that existed in significant numbers in the national economy, Therefore, Plaintiff was not disabled under the Act at any time from her alleged onset date of September 9, 2010, through June 30, 3014, the date last insured. R. 28- 29.

## C.    Cross-Motions for Summary Judgment

Plaintiff claims that the ALJ erred in finding that Plaintiff was not disabled under the meaning of the Act and therefore not entitled to DIB. Plf. Summ. J., ECF No. 17. According to Plaintiff, the ALJ's decision was erroneous because: (1) ". . . the judge said that I did not mentioned [*sic*] my fibromyalgia. . .;" (2) there are differences between Plaintiff's testimony and the hearing transcript; and (3) substantial weight should not have been given to the Consultant's opinions because they did not examine her. *Id.*

Defendant essentially argues that substantial evidence supported the ALJ's finding because he proceeded through the five-step sequential evaluation process and accounted for all of Plaintiff's severe and non-severe impairments in a comprehensive RFC assessment that accounted for her functional limitations. Def. Summ. J., ECF No. 23.

In Plaintiff's Opposition to Defendant's Cross Motion for Summary Judgment, Plaintiff states that she disagrees with the statement "physical examinations consistently document full strength, a normal gait, and no atrophy," "mental status examinations throughout the relevant period were normal," and "Plaintiff was capable of a range of sedentary work." Plf. Opp. to Def. Mot. for Summ. J., ECF No. 26 [hereinafter "Plf. Opp."].

Plaintiff is proceeding *pro se* and therefore the Court must attempt to construe legal arguments from Plaintiff's pleadings. The undersigned addresses each of Plaintiff's claims in her Motion for Summary Judgment, the first and second claims being incorrect and the third claim

not an error at all. Regarding Plaintiff's Opposition to Defendant's Motion for Summary Judgment, the undersigned addresses these claims as Plaintiff's fourth claim, construing them to be a substantial evidence argument, and finds that the ALJ's decision was based on substantial evidence.

### a. Evaluation of Error 1 and 2

Plaintiff claims that the ALJ's decision was erroneous because the ALJ did not mention Plaintiff's fibromyalgia in his decision and there are differences between Plaintiff's administrative hearing testimony and the hearing transcript. Plf. Summ. J., ECF No. 17. The Court disagrees.

Plaintiff's argument that the ALJ did not mention her fibromyalgia is incorrect because the ALJ's decision explicitly mentions it. On page four (4) of the ALJ's decision, the ALJ states, "[t]he record did not reveal the claimant's reported fibromyalgia as a 'severe' impairment." R. 18. Plaintiff's fibromyalgia was considered by the ALJ. Based on a review of the entire record, he determined that Plaintiff's fibromyalgia was not a severe impairment that warranted a review for DIB because the medical evidence failed to exclude other disorders that caused the same or similar symptoms as fibromyalgia. R. 18. Thus, Plaintiff's argument lacks a basis in the record because the record clearly establishes that Plaintiff's fibromyalgia was analyzed during the five-step sequential evaluation process.

Plaintiff's argument that the ALJ erred by noting a difference between Plaintiff's administrative hearing testimony and the hearing transcript is also incorrect. It is peculiar that Plaintiff makes such an argument because in the same paragraph that Plaintiff makes this claim, she also states, "I am not sure of what I said during the hearing due to my memory trouble and my limited ability to concentrate [a] for long period of time." Plf. Summ. J., ECF No. 17. The

Court wonders how Plaintiff claims that there is a discrepancy between the testimony and the transcript if Plaintiff cannot recall what was said. Further, Plaintiff has not provided the Court with any evidence that the court reporter, Carrie Angolia, took an inaccurate record of the proceeding or provided an inaccurate transcript. Plaintiff's argument has no basis in the record.

### b. Evaluation of Error 3

Plaintiff claims that the ALJ erred when he apportioned substantial weight to the Consultants' opinions and partial weight to her primary care provider's opinion because they did not examine her. Plf. Summ. J., ECF No. 17. However, SSR 96-6p does not require that the Consultants examine a claimant before providing their findings of fact and opinion. *See* Social Security Rule 96-6p, 1996 WL 347180, at *2 (S.S.A). The ALJ followed the requirements of opinion evidence under SSR 96-6p and correctly assigned weight to the opinion evidence.[3] Therefore, the Court finds Plaintiff's argument meritless.

Social Security Rule 96-6p requires an ALJ to consider and evaluate findings of fact and opinions of Consultants. SSR 96-6p. Administrative law judges are not bound by findings made by Consultants, but they may not ignore these opinions and must explain the weight given to the opinions in their decisions. *Id.* In his decision, the ALJ did not ignore the Consultants' opinions. He apportioned weight—substantial weight—to their opinions and explained the weight given to the opinions. The ALJ reasoned that the Consultants explained their opinion thoroughly using program knowledge, professional expertise, and available evidence. R. 26. The ALJ also pointed out that although new and material evidence was presented at the hearing that supported greater non-exertional limitations than opined by the Consultants, substantial weight was still given to

---

[3] On March 27, 2016, SSR 17-2p, 2017 WL 3928306 rescinded and replaced SSR 96-6p. However, upon review of the Rule, this Court finds that SSR 17-2p does not apply retroactively and, therefore, reviews the decision using the rules that were in effect at the time of the decision. *See Baker v. Berryhill*, 2018 U.S. Dist. LEXIS 165857, *14 n. 3 (N.D. Ala. September 27, 2018).

their opinion because it demonstrated Plaintiff's RFC and a finding of not disabled. R. 26. The ALJ also analyzed other medical opinions according to SSR 96-6p. Accordingly, the undersigned finds that the ALJ did not commit an error when apportioning weight to the Consultants' opinions. The ALJ satisfied SSR 96-6p requirements by considering the opinion evidence, assigning each opinion a weight, and explaining his reason for assigning such a weight. This Court finds no error with the ALJ's conclusions.

### c. Evaluation of Error 4

The Court construes Plaintiff's arguments that she disagrees with the statements, "physical examinations consistently document full strength, a normal gait, and no atrophy," "mental status examinations throughout the relevant period were normal," and "Plaintiff was capable of a range of sedentary work," as a substantial evidence argument and proceeds with an analysis accordingly. Plf. Opp., ECF No. 26. The Court finds that substantial evidence supports these statements.

Plaintiff disagrees with the ALJ's finding that her "physical examinations consistently document full strength, a normal gait, and no atrophy" because Plaintiff has plantar fasciitis, which bothers her while she walks, she suffers from headaches and severe vertigo, she has difficulty opening jars because of right arm pain, and she was diagnosed with fibromyalgia by Dr. Tomkins. Plf. Opp., ECF No. 26. However, the medical record indicates that these issues are not considered impairments under the Act.

For example, Plaintiff's plantar fasciitis was not considered an impairment because it did not last for twelve (12) months, the duration requirement under 20 C.F.R. § 404.1509. R. 18. Additionally, the record indicates that in June 2011, Plaintiff was able to walk her daughter to school; in April 2012, Plaintiff reported that she had been walking every day; and in May 2014,

Dr. Jones reported that Plaintiff could walk on her heels and toes. R. 656, 712, 1136.

Plaintiff's headaches and arm pain were also not considered impairments because they were not supported by medical evidence. *See* R18-19. Regarding Plaintiff's headaches, multiple MRIs and CT scans were unremarkable and an MR angiography of Plaintiff's brain was normal. R. 424-428, 434-436, 524, 531, 554. Plaintiff received total relief from her headaches with Mazalt. R. 931. For Plaintiff's complaint of arm pain, there was no diagnosis of hand arthritis from any acceptable medical source or based on any objective tests. R. 18. X-rays of Plaintiffs hand revealed no fracture or dislocation and there was no radiographic evidence of rheumatoid or osteoarthritis. R. 1171.

Finally, regarding Plaintiff's fibromyalgia, the ALJ stated that it was not considered a severe impairment because there was no other medical evidence excluding other disorders. R. 18. Although Dr. Tomkins concluded that Plaintiff has fibromyalgia, he also concluded that Plaintiff's metabolic abnormalities might explain her symptoms. R. 935. In September 2013, Plaintiff reported that Lyrica helped her with body aches and that there were no specific tasks that were impossible or difficult. R. 923-24. In December 2013, Plaintiff reported a complete resolution of myalgia while she was taking Prednisone. R. 1120. Doctor Tomkins reported in April 2014 that Lyrica was providing relief for Plaintiff's diffuse muscle pain. R. 1155. Further, the record is absent of evidence that such pain did not originate from Plaintiff's severe musculoskeletal impairment. R. 18; 943, 1260. The Court finds that the ALJ's conclusion was based on substantial evidence.

Plaintiff also disagrees with the ALJ's statement, "mental status examinations throughout the relevant period were normal," because mental health assessments in January 2012 indicate that she suffered from depression. Plf. Opp., ECF. No. 26. Nevertheless, a mental status

examination in February 2012 was normal with no suicidal or homicidal ideation. R. 967. In May 2012, Plaintiff indicated that she was doing well on medication, was less anxious, and had a less labile mood. R. 708. Various mental status examinations following May 2012 revealed that Plaintiff had an appropriate affect and mood, good grooming, made good eye contact, was pleasant, and had no suicidal ideations. R. 954, 775, 945, 951, 1009. Thus, the Court finds that the ALJ's statement regardings Plaintiff's mental health was based on substantial evidence.

Finally, Plaintiff disagrees with the ALJ's statement, "Plaintiff was capable of a range of sedentary work," because Dr. Sachdeva stated that she cannot perform a sitting job with little movement, her fibromyalgia is the "single most limiting problem," and Plaintiff's episodes of vertigo prevent her from working. Plf. Opp., ECF No. 26. There appears to be a discrepancy, however, between Dr. Sachdeva's statement and what the ALJ wrote in his decision: Dr. Sachdeva stated that Plaintiff cannot perform a sitting job without little movement, but the ALJ stated that Dr. Sachdeva concluded that Plaintiff could perform a sitting job with little movement. *Compare* R. 26 *with* R. 502. Plaintiff is not prejudiced by this error because there is other medical evidence that indicates Plaintiff can perform sedentary work.

For example, Dr. Tomkins noted that Plaintiff's fibromyalgia limits her to "sedentary work that does not require ambulation beyond five minutes at a time, or lifting more than five pounds, or lesser exertion prolonged past 10 minutes." R. 943, 1260. The State medical consultants also determined that Plaintiff could perform sedentary work. R. 26, 127-130, 145-150. Therefore, even with this possible error in the ALJ's findings, there is other substantial evidence to support his statement that Plaintiff is able to perform sedentary work. Thus, any error was harmless.

Regarding Plaintiff's argument that her fibromyalgia is the "single most limiting

problem" preventing her from working, the Court finds that this argument lacks merit. Although Doctor Tomkins made this statement, he also stated in two (2) letters that Plaintiff is limited to "sedentary work that does not require ambulation beyond five minutes at a time, or lifting more than five pounds, or lesser exertion prolonged past 10 minutes." R. 943, 1260. Additionally, as noted previously, Plaintiff experienced improvement with her fibromyalgia when she took Lyrica and Prednisone. R. 923-24, 1120, 1155. Throughout the relevant time period, Plaintiff was able to engage in routine domestic tasks, had normal strength, and experienced improvement in her symptoms. R. 656, 923-24, 926, 1220. Therefore, the ALJ's statement that Plaintiff can perform a range of sedentary work was based on substantial evidence.

Plaintiff's statement that her vertigo prevents her from working is discredited because Plaintiff's brain imaging was unremarkable, she was generally alert and oriented, and her gait was mostly normal. R. 424-428, 434-436, 524, 531, 554. In addition, Plaintiff reported an improvement in her dizziness and her paresthesia was less frequent. R. 435, 765. Therefore, Plaintiff's argument that she is unable to work because of her vertigo is unavailing.

Accordingly, the Court finds that the ALJ's statements were based on substantial evidence. The ALJ conducted a thorough review of Plaintiff's subjective complaints, diagnostic tests and treatment records, opinions from Plaintiff's medical providers, and the opinions of the State agency consultants. There is no reason for the Court to remand this case.

## V.    CONCLUSION

For the reasons set forth above, Plaintiff's Motion for Summary Judgment is DENIED, and Defendant's Motion for Summary Judgment is GRANTED.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record and the *pro se* Plaintiff.

/s/
Ivan D. Davis
United States Magistrate Judge

March 15, 2019
Alexandria, Virginia